ALICE V. MILLER and Another, as Executors, etc., of RANDOLPH H. MILLER, Deceased, Respondents, *v.* THE STATE OF NEW YORK, Appellant.*

(Claim No. 19615.)

Third Department, January 14, 1931.

* Affg. 137 Misc. 768.

*Hamilton Ward, Attorney-General* [*L. A. Walker, Deputy Assistant Attorney-General,* of counsel], for the appellant.

*Lusk, Buck, Ames & Coon* [*Clayton R. Lusk* of counsel], for the respondents.

HINMAN, J. Prior to November, 1928, the State of New York had constructed a State highway and had maintained it by the patrol system. On November 8, 1928, the State entered into a contract with one McAllister for the reconstruction and widening of about six miles of that highway. The reconstruction was of concrete thirty feet wide, consisting of three strips, each ten feet wide, except where the roadway narrowed to go through a railroad underpass. There the roadway was narrowed to twenty-six and three-tenths feet.

On November 15, 1929, all the concrete had been laid. The last strip of concrete laid had been the center panel, ten feet wide and two hundred and seventy-five feet long, at this underpass, which had been laid about twenty days but had not yet been opened to traffic. It had been covered with hay to protect the concrete and the hay was kept in place by stones placed along the edges about four or five feet apart and by iron forms about ten feet long weighing about one hundred pounds laid across the hay about twenty feet apart. The hay had, by November fifteenth, become spread out and encroached somewhat upon the outer panels and the iron forms had become out of place, so that there were three or

four in the hay at the west end of the center strip lying diagonally across the strip.

Under the provisions of the contract the State road so reconstructed was to be kept open for a safe passageway for traffic and was so kept open at all times during the construction period, including the 15th day of November, 1929, and there was considerable traffic upon it. The contractor agreed he would erect "suitable barriers and place red lights around and in front of his work whenever and wherever it is necessary to protect the travelling public and to indicate to them by day and night the impassable conditions on such highway, if any exist, * * *." No red lights were ever placed around or in front or anywhere in the vicinity of this center strip at the underpass and the only lights used in the vicinity of this obstruction of hay, stones and pieces of iron were two so-called cannon ball flares, one in the middle of the road at the easterly end and one in the middle of the road at the westerly end, about 275 feet apart. The westerly end was about sixty-eight feet west of the southerly concrete abutment of the underpass, which abutment arose perpendicularly from the edge of the southerly strip of concrete roadway. At that point and for a short distance westerly therefrom the southerly strip of concrete was narrowed from ten feet to seven or eight feet and leaving no shoulder between the paved road and the abutment to the underpass. The elevation of the highway west of the underpass was such that a person driving towards it from the west could see the flare, if lighted, in the middle of the road from at least 1,600 feet west of the underpass down to the underpass. With the exception of a weather-beaten, soiled sign at the westerly end of the new construction work, some five miles away, indicating that some road was under construction, and an optional detour sign, some miles away from the underpass, there was no sign or warning to the traveling public except the flares. There were no reflectors or other warning signs that there was an underpass or a narrowed highway or a concrete abutment at the very edge of the paved road. These conditions, together with the obstructions in the center panel, made this highway at this point a dangerous place for traffic, especially if the flares should blow out in a strong wind. Such flares will, according to the proof, blow out in a strong wind. For about two weeks a watchman had been kept there nights to protect the green concrete but he was then taken off.

There was a strong wind blowing in the afternoon, evening and night of November 15, 1929. Claimants' testate, who lived a long distance away and was unfamiliar with the situation, was driving easterly on this highway on that evening. For five or

six miles west of the underpass he had been traveling over this new
completed roadway thirty feet wide. At the time he reached the
underpass there was no light burning although the flares had been
lighted at about four-forty-five that afternoon. As he reached
the obstructions placed in the road to protect the concrete center
strip, he was driving with his left wheels on the center strip and
his right wheels on the southerly strip, at a speed of twenty to
thirty miles an hour. His car struck one of these obstructions,
was thrown to the right and ran into the southerly abutment of
the underpass before he could turn back into the highway. He
sustained injuries from which he died shortly thereafter.

An engineer had been employed by the State in the Highway
Department of the State to see that the provisions of the contract for
this road construction were carried out. He had full authority
to control and direct the superintendent in charge of this work
in the matter of lights, barricades, signs and warnings to carry
out the provisions of the contract for the protection of the public.
He was there on the job day after day and knew the conditions.
He knew that this dangerous strip was lighted only by one flare
at each end and that a strong wind would blow them out. He
knew the wind was strong on the afternoon of November 15, 1929.
He knew that there were no other warning signs, that no red lights
were ever placed there as required by the contract, that the watch-
man had been taken off and that the conditions there were dangerous
to the traveling public if the flares blew out. His directions as
to lights, signs and warnings on this highway had been complied
with by the superintendent in charge of construction for the
contractor.

The Court of Claims has found that there was a dangerous
condition at this underpass; that it was the duty of the State
to protect the traveling public from this dangerous condition by
suitable warnings; that the State through its engineer in charge
of the work, was negligent in permitting the dangerous condition
to be and remain as it existed on the evening of November 15,
1929, without giving the public adequate and reasonable warning;
and that claimants' testate was not guilty of contributory negli-
gence. An award has been made to claimants against the State
and the Attorney-General appeals from the judgment.

The State is immune from both action and liability except by
its consent. Its consent must waive not only its immunity from
being sued at all but its immunity from liability for the torts of
its officers and agents. This rests upon grounds of public policy
that no obligation of the State arises from the torts of its officers
and agents without waiver by some positive enactment of the

Legislature and such statutes in derogation of the sovereignty of a State must be strictly construed. (*Smith* v. *State of New York*, 227 N. Y. 405.) By sections 12 and 26 of the Court of Claims Act (formerly section 264 of the Code of Civil Procedure) the State waived its immunity from action and nothing more. Its immunity from liability for the tortious acts of its officers and agents was not thereby waived. (*Smith* v. *State of New York*, *supra*.) Among the statutes which the Legislature has passed waiving its immunity from liability is section 176 of the Highway Law (enacted by Laws of 1908, chap. 330, as revised by Laws of 1909, chap. 30). In its original language that section contained no waiver of liability, but in 1910, by chapter 570 of the laws of that year, said section was amended to give a· cause of action for damages suffered by any person from " defects " in State and county highways " maintained by the State by the patrol system." (See, also, Laws of 1912, chap. 83, and Laws of 1916, chap. 578, amdg. said § 176.) The damages suffered had to be directly attributable to " defects " in the highways named. The negli- gence relied upon had to be negligence in respect to the cause or continuance of the " defects." " Failure to give warning of a defect is not such negligence." (*Belair* v. *State of New York*, 212 App. Div. 206, 209; affd., 241 N. Y. 552.) It was provided in said section 176, as amended by chapter 371 of the Laws of 1922, and as that section read in the year 1929, as follows: " The State shall not be liable for damages suffered by any person from defects in State and county highways, except *between the first day of May and the fifteenth day of November on such highways as are maintained by the State under such system as the Commissioner of Highways* *may adopt pursuant to section one hundred and seventy * * *.*"

The accident must happen " between " the dates named in the section and the accident in question happened on November 15, 1929. It has been held that the word " between " strictly interpreted is intermediate and means exclusive of the dates mentioned. (*Bunce* v. *Reed*, 16 Barb. 347; *Fowler* v. *Rigney*, 5 Abb. Pr. [N. S.] 182.) Whether the language of said section 176 must be thus narrowly construed we do not need to decide.

The real question which arises here is whether section 176 of the Highway Law, relating to " defects " in highways, applies, or section 12-a of the Court of Claims Act, which was added by chapter 467 of the Laws of 1929, and which went into effect September 1, 1929. That section provides as follows:

" § 12-a. [Waiver of immunity by State from liability for torts

of its officers and employees.] The State hereby waives its immunity from liability for the torts of its officers and employees and consents to have its liability for such torts determined in accordance with the same rules of law as apply to an action in the Supreme Court against an individual or a corporation, and the State hereby assumes liability for such acts, and jurisdiction is hereby conferred upon the Court of Claims to hear and determine all claims against the State to recover damages for injuries to property or for personal injury caused by the misfeasance or negligence of the officers or employees of the State while acting as such officer or employee. * * *."

Section 176 of the Highway Law was not expressly repealed but it was partially at least superseded by section 12-a of the Court of Claims Act. The former is confined to claims for damages caused by "defects" in certain highways and such damages must be suffered within a certain period of the year. Otherwise the State is not liable under that section. By the other section the State completely assumes liability for damages caused by the misfeasance or negligence of the officers or employees of the State while acting as such officer or employee, whether such damages were sustained on a highway or otherwise or at any time of the year. These two sections must be read together. Difficulty may arise in determining in a given case whether damage was caused by a defect in a highway as distinguished from the misfeasance or negligence of the State's officers or employees. We may assume it to have been within the legislative purview that the State might be held liable for a defect in a highway not caused by such misfeasance or negligence. We do not reach that question here. In *Whitney* v. *Town of Ticonderoga* (127 N. Y. 40) a road scraper was left upon the highway where plaintiff collided with it in the night time. The court held that a highway may be rendered "defective" no less by an obstruction placed in it than by a physical disturbance or injury to the bed of the road. No complaint is made in the instant case that the injury was caused by a defective highway in the sense that hay, stones and iron were placed on the highway. It was the usual and proper method of protecting the green concrete from destructive traffic until it was cured and ready for use. In a very real sense this unfinished center strip was not yet highway open to traffic. The entire claim is founded upon failure to give adequate warning of the dangerous condition. It was the failure to give that warning which was the proximate cause of injury. Failure to give warning of a defect, if such it was, is not within the scope of section 176 of the Highway Law. (*Belair* v. *State of New York, supra.*) To charge the State with

liability therefor in the present case it is essential that decedent's death be attributable to the negligence of the State's engineer within the provisions of section 12-a of the Court of Claims Act, in failing to protect the traveling public from this dangerous condition by suitable warnings.

That fact was supported. The State's engineer had full authority under the contract and assumed complete control and direction as to warning signs at this location and he had full responsibility therefor. His duty did not directly involve placing the warning signs there but he had the duty of inspection and direction to see that they were adequate and remained adequate. This was the State's duty under the contract and it seems that it was a nondelegable duty which it could not escape by letting the work to an independent contractor. (*Storrs* v. *City of Utica*, 17 N. Y. 104, 108; *Turner* v. *City of Newburgh*, 109 id. 301; *Deming* v. *Terminal Railway of Buffalo*, 169 id. 1, 10.)

The judgment of the Court of Claims should be affirmed, with costs.

All concur.

Judgment affirmed, with costs.