LUCILLE L. NEDDO, as Executrix of FRANCIS J. NEDDO, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant.

(Claim No. 28836.)

Court of Claims, December 21, 1948.

*James A. Leary, Walter A. Fullerton* and *John J. Lynch* for claimant.

*Nathaniel L. Goldstein, Attorney-General (James A. Austin* and *David Marcus* of counsel), for defendant.

*Charles B. Sullivan* of counsel.

GORMAN, J. On January 28, 1947, at about 5:20 P.M., Francis J. Neddo was driving his Buick automobile up Trask Hill on Route 9P in the outside tax district of Saratoga Springs, New York. He was traveling alone in a westerly direction on the north lane of the three strip concrete highway.

A caterpillar Diesel No. 12 road scraper, with blade and scarifier attachments, was engaged in removing ice and snow from the same part of the highway. It was proceeding down grade in an easterly direction at a slow rate of speed on its wrong side of the road. The front end of this machine was unlighted and projected sixteen feet ahead of the enclosed operator's cab. The only lights on the grader were two small white lights attached to the top front corners of the cab. These lights were stationary on fixed brackets, being six feet eight inches apart, about ten feet above and parallel with the roadway; one light was

slightly higher than the other and both were covered with a fine wire mesh. The grader itself was twenty-seven feet long, with an operating blade angled ten feet wide and was dirty yellow in color. The machine weighed about eleven tons and was being operated at the time by one man.

The Neddo car collided head on with the right front wheel of the grader at a point some distance below the top of the hill and Neddo was fatally injured. The two vehicles remained in juxtaposition after the crash.

The road, as it approached the scene from the east, was straight for over a mile and up a sharp grade. For a long distance on either side of the place of collision, towering trees and heavy woods flanked the roadway and about 450 feet west of said point there was a wooded island or mall dividing the road into two separate lanes. The trees on the island merged with the tall trees and foliage along the highway to screen the sky line from those traveling west. There was a lighting pole located near the east end of the mall supporting a gooseneck arm with a small incandescent light facing east about fifteen feet above the roadway. A number of other poles were situated along the north side of the highway each side of the accident. Certain of these poles carried small incandescent lights on similar arms projecting over the roadway. These lights were about the same height from the ground and were widely separated and irregularly spaced. They looked like the lights on the grader. It was dark at the time and place of the accident although these lights were in use. The entire locality is wooded and sparsely settled. Because of these conditions and lack of sunlight upon the road surface, this hill has been dangerous to travel by reason of ice accumulating during the winter months. Much work was necessary to keep it passable and it was sanded frequently. The road surface was dark and dirty.

As Neddo came up the hill that night he was and for quite a distance had been followed closely by two cars. The respective owners of these cars, Messers. Shaw and Nicholson, were the only disinterested eye witnesses to the accident. They testified they saw the Neddo car proceeding up the sharp grade. It was traveling about thirty miles an hour in a straight line on its right side of the road. They saw its headlights and tail light in working order. They saw the tail light swerve sharply to the left and abruptly stop at about the instant they heard the crash. They did not see the grader prior to the accident. They did not distinguish the grader's lights. They saw no obstruction

in Neddo's path. They did not know with what he had collided until they passed the vehicles and stopped their own cars. They testified the lights on the grader appeared to be in line with the street lights on the mall and along the north edge of the highway. They were corroborated by another disinterested witness, Caldwell, who came along immediately afterward. The same illusion as to lights almost involved him in the accident. He didn't see the grader nor distinguish its lights from the other lights until he struck the rear right corner of the Neddo car. No flares, flags, flagman, signs or other warning was in use at the time. The operator of the grader concededly gave no signal of any kind.

The grader was owned by the Town of Saratoga and with its operator was being employed at the time by the County of Saratoga under a written contract with the State of New York. This contract, dated October 14, 1946, was made pursuant to chapter 305 of the Laws of 1946, amending section 12 of the Highway Law by enlarging the definition of '' maintenance '' therein to include the control of snow and ice. Prior to 1946, it was the duty of the County of Saratoga and the Town of Saratoga to remove snow and ice on the State highways within that county and town. (Highway Law, §§ 55, 140 subd. 9.)

The State contends that its Superintendent of Public Works had no authority to make the above contract because this area is inside the city limits of Saratoga Springs and therefore this court has no jurisdiction. Whether or not the contract is *ultra vires* is the serious question in this case. Section 12 of the Highway Law was derived from section 170 of chapter 30 of the Laws of 1909, and prior to its amendment in 1946, fixed responsibility for maintenance and repair of State highways in towns and incorporated villages upon the State. Section 344 of the Highway Law was derived from chapter 30 of the Laws of 1909, as added by section 2 of chapter 18 of the Laws of 1921, providing that a State highway may not be constructed or maintained in any city with the exception, '' excepting that portion of a third-class city lying outside of its corporation tax district where such city embraces the entire area of a former township.''

Saratoga Springs is a third-class city incorporated pursuant to chapter 229 of the Laws of 1915, as amended by chapter 229 of the Laws of 1916, effective April 17, 1916. By the terms of its charter the city consists of three tax districts to be known as the '' city tax district '', the '' inside tax district ''

and the " outside tax district ". The city tax district consists of the territory within the boundaries of the former Town of Saratoga Springs, the inside tax district consists of the territory within the boundaries of the former Village of Saratoga Springs, and the outside tax district consists of the territory outside of the inside tax district. The inside tax district and the outside tax district are separate " highway " and " excise " districts. The charter provides that " the city tax district shall be liable for the debts and liabilities of the town of Saratoga Springs, and shall be entitled to all state aid, and money benefits for support of highways, in the same manner as if the said territory continued a town, * * *." The charter itself, granted to the City of Saratoga Springs, is legislative approval of these separate tax and highway districts.

This highway, known as Route 9P, is designated a State highway by section 341 of the Highway Law and is called the " Saratoga Lake outlet — Saratoga " highway. It begins at the outer boundary of the city of Saratoga Springs at the Saratoga Lake outlet which is the outer boundary of the outside tax district and was the outer boundary of the former Town of Saratoga Springs and runs westerly to the dividing line between the outside and inside tax districts of the city, which was the former boundary of the incorporated Village of Saratoga Springs. It was built in 1930–1931, with State funds under authority granted to the Superintendent of Public Works of the State by section 341 and section 344 of the Highway Law. It has ever since been maintained and repaired by the Superintendent of Public Works of the State under authority granted to him by former section 12 and section 344 of the Highway Law.

The State claims " corporation tax district " means " City of Saratoga Springs ". Claimant says it means the " inside tax district " or former incorporated Village of Saratoga Springs and that the public authorities have so construed it for thirty years.

The map of the county, which is referred to in paragraph 6 of the agreement between the State and County of Saratoga, shows Route 9P as located in the outside tax district to be a State highway. Subdivision 43 of section 341 of the Highway Law names this highway as a State highway. The official State highway map, as filed and approved pursuant to section 343 and section 345 of the Highway Law, indicates the same.

Where a statute contains a map showing in detail what roads are included, such map is as binding as any other portion

of the statute. (*Town of Newton* v. *State Highway Comm.*, 192 N. C. 54, rehearing denied 192 N. C. 834.)

A State Legislature has the power to designate State highways and its action is binding on its minor political subdivisions.

For many years prior to 1946, the Superintendent of Public Works of the State authorized snow removal from this portion of the highway by the county and town and the State paid its share for such work through the winter of 1946. The reason for the amendment to section 12 was to relieve the towns and villages of their portion of this financial burden. (See Governor's memorandum approving L. 1945, ch. 752, amdg. Highway Law, § 46.) The reason for the exception in section 344 was to relieve certain third-class cities with high and low tax districts from equal service based on unequal rates. The Legislature realized the necessity for proper street maintenance for both districts as a matter of public safety. It also recognized that such expense in low income producing districts, comprising sparsely settled and unimproved former townships, would constitute an unfair and prohibitive burden upon the city as a whole. We may take judicial notice of the fact that when section 12 was amended in 1946, many municipalities of the State were struggling financially with their public services, including snow removal, because of constitutional limitations or overwhelming tax burdens. The relief afforded therein, of course, does not apply to cities except those exceptions heretofore mentioned in section 344. We believe Saratoga Springs to be such an exception. If corporation tax district as used in the section means the entire City of Saratoga Springs, or any other city within the exception, then the exception is meaningless, as no third-class city could qualify, as no portion of it would be outside its corporation tax district. If section 344 is not read together with section 12, then the section is meaningless and a nullity. A statute may not be so construed. The statute should not be given a tortuous or an illogical construction. It is an act of the Legislature in accordance with the State's official forward looking and more liberal program and as such should be given an interpretation consonant with its intended purpose and design. The State's contention that section 344, in effect, must be read alone is unsound. Under this construction the aforesaid exception means nothing. Statutes in " pari materia " should be construed together. If any ambiguity exists in the Highway Law as to the authority and duty of the State relative to this particular location, and we think none does exist, such ambiguity has been resolved by the practical construction placed upon it

by all parties since its construction and designation. The Court of Appeals has recently held that delegated sovereignty as a State agency implies certain powers unless expressly negatived. (*N. Y. City Tunnel Authority* v. *Consolidated Edison Co.*, 295 N. Y. 467.)

The State further contends that the County of Saratoga was an independent contractor, that snow removal activities under the contract were not inherently dangerous and that any negligence was collateral to the work. Where from the nature of the work the duty of care in its performance is nondelegable and danger may reasonably be expected, the rule is otherwise.

Under the contract herein, the State retained control of snow removal at the time and place of the accident. Through its designated representatives, the Superintendent of Public Works and the resident Assistant District Engineer, it retained direction and prior approval of the schedule of operations, the sequence of performance, and use of men and equipment, including the machine in question. All work was under their supervision and the work could be altered or stopped by them at any time. Under these circumstances, we do not deem the County of Saratoga an independent contractor.

Whether or not an independent contractor relationship existed, the State is under a duty to maintain its highways in a reasonably safe condition for travel at all seasons of the year. (*Doulin* v. *State of New York*, 277 N. Y. 558.) It could not delegate that duty to another. (*Miller* v. *State*, 137 Misc. 768, affd. 231 App. Div. 363; *Wright* v. *Tudor City Twelfth Unit Inc.*, 276 N. Y. 303; *Boylhart* v. *DiMarco & Reimann Inc.*, 270 N. Y. 217; *Schwartz* v. *Merola Bros. Construction Corp.*, 290 N. Y. 145, 152.) The construction and maintenance of highways is one of the primary governmental functions of the States. (See *Atkin* v. *Kansas*, 191 U. S. 207, 221; *Sherman* v. *United States*, 282 U. S. 25, 29.) Liability therefor does not exist at common law. (*Seeyle* v. *State*, 178 Misc. 278, affd. 267 App. Div. 941.) It is predicated upon affirmative legislative assumption, (Court of Claims Act, § 8; L. 1939, ch. 860; *Karl* v. *State of New York*, 279 N. Y. 555).

Section 318 of the Highway Law, in part provides that " every vehicle  *  *  *  shall have attached thereto a light or lights so placed as to be clearly visible  *  *  *." Section 15 of the Vehicle and Traffic Law, makes provision for several lights clearly visible. A highway has been held to be defective where a four-wheeled-wagon truck with a scraper attachment was left in the highway over night without lights or guards. (*Whitney*

v. *Town of Ticonderoga,* 53 Hun 214, affd. 127 N. Y. 40.) Irrespective of any duty to remove ice and snow from this part of the highway, it was the duty of the State to keep same open and unobstructed and to guard travelers against such dangers as could or ought to have been anticipated or foreseen in the exercise of reasonable care. (*Ziehm* v. *State of New York,* 270 App. Div. 876; *Barna* v. *State of New York,* 267 App. Div. 261, affd. 293 N. Y. 877; *McLane* v. *State of New York,* 53 N. Y. S. 2d 194, 197; *Wagner* v. *State of New York,* 177 Misc. 1078; *Martin* v. *Herzog,* 228 N. Y. 164; *Treman* v. *State of New York,* 121 Misc. 862.)

There is sufficient evidence to conclude that the resident Assistant County Engineer and the County Superintendent of Highways had actual notice of the defective and dangerous character of this machine when used on public highways after dark. Notice to them was notice to the State. (*Karl* v. *State of New York,* 279 N. Y. 555, *supra; Pierce* v. *State of New York,* 41 N. Y. S. 2d 602, 604.) The lights on the grader were inadequate and were not clearly visible for night work under circumstances such as these. The State knew it was being used on this highway and should have reasonably foreseen its probable use in the nighttime on the wrong side of the road. In fact, the State introduced evidence that plowing downhill on the wrong side of public highways with this and similar machines was the usual and customary practice. The State had previously approved the use of this particular grader for this particular job. Under all the circumstances, it was the duty of the State to see that the grader was properly lighted or other adequate warning given. These negligent omissions by the State predicate liability irrespective of any collateral negligence arising from the work itself. (See *Schiverea* v. *Brooklyn Heights R. R. Co.,* 89 App. Div. 340, 344, 345; *Miller* v. *State,* 137 Misc. 768, affd. 231 App. Div. 363, *supra; Water Company* v. *Ware,* 16 Wall. 566, 576; Restatement, Torts, § 418.)

Upon all the evidence, we find that the deceased was not guilty of contributory negligence and the claimant herein is entitled to recover the damages sustained as a result of the accident. From the nature of the work involving the operation of this huge machine upon the wrong side of a State highway after dark, without lights that were clearly visible and distinguishable to oncoming traffic, we find the State's duty to warn was nondelegable and that the State did not meet the standard of care required, under the circumstances. (*Katapodis* v. *La Salle Trucking Corp.,* 293 N. Y. 229.) Such failure was the

proximate cause of the accident. The collision was due to failure of sight and distinguishment at a time when sight should have been aroused and guided by proper warning. (*Martin* v. *Herzog*, 228 N. Y. 164; *Dawley* v. *State*, 186 Misc. 571.) A lighted red lantern upon the front of this machine, undoubtedly would have prevented this fatal accident. Liability follows where an injury is the natural and proximate consequence of neglect of duty. (*LeBoeuf* v. *State*, 169 Misc. 372, affd. 281 N. Y. 737.)

We know of no new formula prescribed for the triers of fact to follow in arriving at their verdict for the pecuniary loss sustained in an action for causing the death of a decedent. (*Liddie* v. *State*, 190 Misc. 347, 350.) The assessment of damages, difficult in all cases, is especially difficult where death results from the accident. The precise question in this claim, is what were the probable chances of pecuniary benefit, from the continuance in life of the decedent, worth under all the existing circumstances (*Thomas* v. *Utica & Black River R. Co.*, 6 N. Y. Civ. Pro. Rep. 353; *Arnold* v. *State of New York*, 163 App. Div. 253.) We may also be mindful of the present day devaluation of the dollar. (*Burtman* v. *State of New York*, 188 Misc. 153 [1947].) Decedent at the time of his death was thirty-nine years of age. A former athlete and graduate of Colgate University and Harvard Law School, he possessed a trained mind and sound body. Since his admission to the Bar in 1933, he had progressed rapidly in his profession. He was an outstanding trial lawyer and since 1943, had been a partner in an active law firm. His income had risen from $1,530 to $15,000 within a few years. He had the foundation of youth, education, success and security. His chief interests were his home and business and he was generous and devoted to his wife. His prospects for further success in his profession were almost unlimited. He had a life expectancy of twenty-eight years and his widow's expectancy is thirty-six years.

After due consideration, the court has come to the conclusion that the sum of $125,000 is a fair and just compensation for the pecuniary injuries resulting in the death of Francis J. Neddo. To this must be added the sum of $1,816 for funeral expenses, together with interest upon the whole sum from the date of his death. We further award $1,000 for his conscious pain and suffering.

Motions to dismiss the claim herein made at the end of claimant's case and of the entire case, upon which decision was reserved, are denied.

GREENBERG, J., concurs.