tention is expressly negatived by section 5, which provides for the issue of bonds "in addition to the bonds in sections 2, 3, and 4 of this article second authorized to be issued."

In view of the existing conditions, it is unfortunate that the mortgage did not provide for the use of the cash for the purposes specified in section 3. But it provides expressly for the acquisition of these bonds by the issue of plaintiff's bonds. It also provides expressly for the use of the cash for certain specified purposes, which do not include the purchase of the Crosstown bonds.

My conclusion therefore is that the mortgage does not authorize the trustee to use the money in question for their purchase.

Judgment is therefore directed in favor of the defendants, with costs to the defendants. All concur.

---

(163 App. Div. 253)

ARNOLD v. STATE.　(Nos. 206–109 to 206–114.)

(Supreme Court, Appellate Division, Third Department. July 1, 1914.)

1. STATES (§ 112*)—GOVERNMENTAL CAPACITY OF STATE.
　　Where the state owned a race track and invited people to attend automobile races, charging an admission fee, it was not acting in a governmental capacity but in a private capacity.
　　[Ed. Note.—For other cases, see States, Cent. Dig. § 111; Dec. Dig. § 112.*]

2. THEATERS AND SHOWS (§ 6*)—NEGLIGENCE.
　　Where automobile races were held on the state fair race track, which was circular in form, and the terrific speed of the machines tended to make them leave the track, reasonable care required the construction of guards to prevent machines leaving the track from striking spectators, and it was negligence to permit racing cars to be driven in excess of a mile a minute where spectators on the sides of the track were protected only by a flimsy wooden fence.
　　[Ed. Note.—For other cases, see Theaters and Shows, Cent. Dig. § 6; Dec. Dig. § 6.*]

3. STATES (§ 112*)—LIABILITY OF STATES.
　　While the state, being sovereign, cannot be sued without its consent, Code Civ. Proc. § 264, providing that the state shall be liable for damages caused by a wrongful act, neglect, or default, authorizes recovery against the state for injuries to spectators at automobile races held at the state fair race track hurt when a machine left the track, which was negligently constructed without guards.
　　[Ed. Note.—For other cases, see States, Cent. Dig. § 111; Dec. Dig. § 112.*]

4. STATES (§ 112*)—LIABILITY OF STATES.
　　Under Code Civ. Proc. § 264, providing that the state shall be liable for damages caused by its wrongful act, neglect, or default, the state is liable for injuries caused by the negligence of state fair commissioners who failed to construct guards to protect spectators standing around the race track on which automobile races were held.
　　[Ed. Note.—For other cases, see States, Cent. Dig. § 111; Dec. Dig. § 112.*]

5. STATES (§ 112*) — LIABILITY FOR TORTS — INDEPENDENT CONTRACTOR — DEFENSES.
　　Where an independent contractor was employed to hold automobile races at a state fair track, for which races the state charged admission,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

the fact that the races were held under the auspices of an independent contractor will not free the state from liability for injuries to spectators killed and maimed when a car left the track, which the state had negligently failed to guard, for it is actionable negligence to permit the holding of such races on a track insufficiently guarded.

[Ed. Note.—For other cases, see States, Cent. Dig. § 111; Dec. Dig. § 112.*]

6. STATES (§ 112*)—INDEPENDENT CONTRACTORS—WHO ARE.

Where the commissioners of a state fair employed a third person to procure entries for automobile races, agreeing to pay him a stipulated sum for his services, such person was not an independent contractor, though the meet was held under his directions; it not appearing that he had absolute control of the work of putting on and conducting the races.

[Ed. Note.—For other cases, see States, Cent. Dig. § 111; Dec. Dig. § 112.*]

7. STATES (§ 112*)—TORTS—CONTRIBUTORY NEGLIGENCE.

Spectators at automobile races held at a state fair who could not obtain places in the grand stand are not guilty of contributory negligence in lining up at the fence on the outside of the track; it not appearing that the managers or directors of the races, who must have known of the danger and of their presence, warned them.

[Ed. Note.—For other cases, see States, Cent. Dig. § 111; Dec. Dig. § 112.*]

8. DEATH (§ 81*)—ACTION—MEASURE OF DAMAGES.

In considering the measure of damages for wrongful death, the elements to be considered are the age, health, habits, qualities, earning capacity, and expectation of life of the decedent, as well as the condition, sex, age, and number of those dependent upon him, but nothing can be allowed for sentiment, for grief, or for suffering.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 103–105; Dec. Dig. § 81.*]

9. DEATH (§ 95*)—ACTIONS—MEASURE OF DAMAGES.

An award of $10,000 for the wrongful death of a chemist 41 years of age, who earned over $2,600 annually, and who was survived by a widow 36 years of age and two small children all dependent and without means, is proper.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 108, 109, 111–115, 120; Dec. Dig. § 95.*]

10. DEATH (§ 95*)—WRONGFUL DEATH—DAMAGES—AWARD.

An award of $5,000 for the wrongful death of a bookkeeper 27 years of age, who was earning $1,000 a year and left surviving him a dependent widow 25 years of age, is sufficient.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 108, 109, 111–115, 120; Dec. Dig. § 95.*]

11. DEATH (§ 95*)—WRONGFUL DEATH—AWARD.

An award of $8,000 on account of the wrongful death of the manager of a publishing house, aged 31 years, who was earning $2,000 a year and had reasonable prospect of speedy promotion, is proper, where he left a dependent widow 29 years of age and an infant child.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 108, 109, 111–115, 120; Dec. Dig. § 95.*]

12. DEATH (§ 95*)—WONGFUL DEATH—AWARD.

An award of $500 for the death of an infant 9 years of age in favor of a surviving parent is sufficient; there being no criterion to measure

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the value of services which he might have rendered during minority or the aid which he might have given later.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 108, 119, 111–115, 120; Dec. Dig. § 95.*]

Appeal from Judgment on Report of Referee.

Separate claims by Eva M. Arnold, as administratrix of Arthur Frederick Arnold, deceased; by Eva M. Arnold, as administratrix of Fred H. Arnold, deceased; by Marie McLauchlan, as administratrix of William H. McLauchlan, deceased; by Peter Lividas; by Bessie W. Ballantyne, as administratrix of Charles E. Ballantyne, deceased; and by Anna B. Youker—all against the State of New York. From a determination by the Board of Claims in the several cases, the State appeals. Affirmed on opinion of the Referee of Board of Claims.

The opinion of the referee is as follows:

Vann, Official Referee. For a long time the state of New York has owned a tract of land in the town of Geddes, county of Onondaga, consisting of about 50 acres, known as the "State Fair Grounds," on which it has held a fair every year for a number of years. Many attractions were presented and many people attended. In 1908 President Roosevelt was present and addressed the people, and in 1911 President Taft. Aside from extensive exhibits of live stock, the products of agriculture and the arts, there were at times flying machines, horse races, and, during five of the later years, automobile races to attract and entertain the spectators.

At an automobile race held during the fair of 1911 one of the competing cars left the track, brushed away the fence around it and, darting into the crowd, killed eleven persons and injured others. Claims were filed against the state by the persons injured, as well as by the personal representatives of those who were killed, for the recovery of damages resulting from the accident pursuant to the statute in such cases made and provided. Four of the claims founded on injuries resulting in death and two of the claims founded on injuries not resulting in death were referred to me as official referee to take the evidence and report the facts with my opinion to the Board of Claims. These cases were tried together, and the leading facts, common to all, are as follows:

In September, 1911, a state fair was held on the grounds of the state, lasting from the 11th to the 16th inclusive. It was conducted, pursuant to the Agricultural Law, by the State Fair Commission, and through their procurement a 50-mile automobile race was held during the afternoon of the 16th, the last day of the fair. The race had been extensively advertised throughout the state by bills posted, handbills distributed, and advertisements printed in more than 300 newspapers. It was managed by C. Arthur Benjamin under arrangement with the State Fair Commissioners, who hired him for the purpose and paid him an agreed sum for his services. The track on which it was held had been constructed some years before mainly for horse racing, but had been used by the state on four previous occasions in four different years for automobile racing. Record after record for both slow and fast time had been made at races held by the state on said track, and during the year 1910, which was the year preceding the accident under consideration, all previous records were broken by a car which made a mile in 47 seconds.

The track, although called circular, was really elliptical in shape, 1 mile in circumference and about 50 feet wide for the most part, but wider in some places, with two straight courses and two curves; each course and each curve being one-fourth of a mile in length. It was constructed of packed clay at great expense and was substantially level, with a slight elevation on the outside. On either side was a wooden fence made of posts eight inches thick set in the ground eight feet apart, with a strip of board one inch thick on top and two boards one inch thick between the top and the ground. It was

built to turn horses, not automobiles. Spectators were expected by the management to stand, and on the occasion in question did stand, next to the fences in order to see the race. While they were excluded from some places, they were not excluded from the place where the accident happened. There was nothing except the fence to prevent a car, if it left the track owing to an accident, from dashing into the crowd and crushing many human beings. At a previous race held by the commission a car had thus left the track and crashed through the fence, but, fortunately, without injuring any one. Warned by this, a second fence had been erected in one place for the race of 1911 to furnish further protection where it was thought to be most needed, but, unfortunately, there was no additional fence at the point where the accident in question happened.

The race was for 50 miles and on the forty-fourth round only three of the seven competitors who had started were left; the others having given up and retired. One was a Knox car driven by Barney Oldfield, a competent man. From the thirty-eighth to the forty-fourth round the tire on the right wheel forward of this car had shown plain signs of wear, with loose pieces flapping and other evidence of weakness. Whether the driver could see this or not does not appear, but some of the spectators saw it with apprehension. Suddenly, without further warning, as Oldfield was making the northeast curve at high speed, there was a loud report like an explosion, his car left the track, tore through the fence as if it had been a cobweb, and plowed into the spectators standing on the inside of the fence several rows deep, crushing out eleven lives and maiming many people, including the intestates and the two surviving claimants. It ran from 60 to 70 feet before it stopped, a substantial wreck.

There were about 50,000 people on the grounds, crowded in almost everywhere about the fences bounding the track, for the grand stand was full. The management knew there would be a great crowd at the races. As Mr. Benjamin testified: "We knew we were going to have a tremendous crowd— at least I knew it—and you can't control them." So they erected the second fence at a dangerous corner to keep the crowd away and "took the chances on the other places whatever they were." He further said that, while there was no "unusual danger" at other points, "there is danger with an automobile, as it is liable to run into a crowd anywhere." The average speed made during this race was about a mile a minute, but it was faster than that on the straight courses and slower on the curves.

[1, 2] Accidents had been frequent on other mile tracks of circular or elliptical shape, and one had happened before on this track. All the experts agree that, if an accident happens to a car going very fast around a curve on a circular track, it is almost certain to leave the track on the outer side and run on, crushing everybody in its course, until friction or obstacles stop it. Skidding has a strong tendency to make a car thus leave the track, and the explosion of a tire generally has that result. Much depends upon the rate of speed, for the tendency increases faster than the speed. As Mr. John Wilkinson, an expert of great skill and experience in managing and making automobiles, testified: "Anybody can drive a car without skidding at 40 miles an hour, but you are not racing until you are going 50 miles an hour, and then there is usually a good deal of skidding in going around a turn." A high car is more liable to skid than a low one, and the Knox car was high, the highest in the race and one of the heaviest. In making a curve at high speed the rear wheels are apt to skid, and "it is a matter of judgment with the driver how much skidding he can stand; the more he can stand the faster he can go and the better driver he is in the race." At the time of the accident the tire on the right wheel forward exploded from some cause not definitely known, but probably owing to the severe strain of rapid motion around the curves.

The great danger to spectators in auto races is the strong tendency of a car to leave the track and run over the people. In case of an accident, whether from skidding, the explosion of a tire, or other causes, as a rule the car leaves the track unless it is guarded in some way so as to prevent it. This track was not guarded at all, for the fence afforded no protection to

speak of against a car weighing from 2,500 to 2,700 pounds, going at a rate approaching a mile a minute.

The state owned the track, invited the people to attend, charged an admission fee, which gave the right of entry to any part of the grounds except the grand stand, and made money out of the races. It was not acting in a governmental capacity as in the case of hospitals, prisons, etc., but as the proprietor of a race track. The track was of such shape, form, and extent, of such construction and with such slight protection against a car running off, that it was not a suitable and proper place for such a race, having in mind the safety of the spectators invited to witness the same. While this track was better than many others, and one of the best of its kind, it was not reasonably safe for a fast automobile race.

A locomotive is confined to iron rails, securely fastened to heavy wooden ties imbedded in the solid earth, yet 60 miles an hour on a straight track is great speed for it to make, and the law requires a high degree of care in maintenance and management. An automobile does not run on rails, but runs on the surface of the ground, with wheels unconfined, and yet the cars in this race were allowed and expected to run from 55 to 60 miles an hour around a curve with nothing but a frail fence between the track and thousands of spectators. Reasonable care required special construction to provide for the safety of those invited by the state to a place of public entertainment provided by itself. .

The Legislature had appropriated $40,000 for construction and repairs during the year 1911, and substantial protection could have been provided from the gate receipts, at slight expense when compared with the cost of the track, by erecting guards or other agencies to arrest the force of the car and stop it if, in case of accident, it should start to leave the track. As the commissioners knew, or should have known, among practicable methods, some in actual use on other tracks where auto racing is allowed, are a decided elevation of the grade toward the outer side of the track, which strongly aids in preventing the car from leaving the track, but impairs its value for horse racing; a cement wall from 2½ to 3½ feet high on the outer lines of the track; a low bank of sand, deep enough to arrest motion but not deep enough to prevent spectators from looking over it, placed between the outer fence and another fence a few yards distant, with careful policing to keep the public from standing on the sand between the fences; two fences of heavy iron rails, one inside and the other outside, or possibly a single strong wooden fence with heavy posts set deep in the earth and covered on both sides with planking three inches thick. Even if the space around the fences had been roped off for a few rods back and the crowd had been kept out of the intervening space, there would have been some and perhaps adequate protection. Some of these methods would have stopped the car in question with no injury to spectators, while others would have strongly tended in that direction and others still would at least have mitigated the horrible catastrophe. While the expense of some of these methods cannot be overlooked, it weighs less than human life in the balance on the other side. If a race cannot be held without inherent and extreme risk to life and limb, the command of the law is that it must not be held at all.

Certain precautions were taken by the commissioners, who were men of high character and standing, but naturally anxious to keep down expenses and increase the income from the fair. The race was held under the auspices of the American Automobile Association, a strong national society, well officered and managed, which controls most of the automobile races in the country. The drivers were carefully selected and were competent. The cars, of standard make, were properly inspected, and there were many policemen, some from a distance, and other special officers, to preserve order and keep people off the track; but, alas, the greatest and most obvious source of danger from a nonprotected track was not guarded against except by a flimsy fence, which could not resist a powerful car, with tremendous momentum, in case it left the track, as the commissioners knew or should have known was liable and even likely to happen.

Whether they should have stopped the race when they saw, if they did see, the badly worn tire in rapid motion, is not found to be actionable negligence,

because the time for thought and action was so short. I hold the state liable for holding or permitting to be held on its own ground, under the circumstances disclosed by the evidence, such a fast race, with powerful cars, on an unprotected track, without the exercise of reasonable care to provide against accidents well known to be likely to happen. If a private individual had done this, he would have been liable, and the sovereign state has graciously imposed upon itself the same liability which is imposed by its laws upon its own citizens.

The State Fair Commissioners were the officers and agents of the state, and what they did and what was done under their direction was done by the state, the same in effect as if they had been the agents of an individual or the officers of a private corporation that owned the track and gave the exhibition, charging an entry fee to the drivers and an admission fee to the spectators. The state is impersonal and cannot hold a fair itself but only through its representatives. The commissioners were its representatives on the occasion in question with broad powers conferred by statute. The state gave them full charge of its extensive property used for the purposes of the fair, required them to hold an annual exhibition, authorized them to make and enforce rules for its conduct, including entries, admissions, exhibits, and "any other matters which they may deem proper in connection with such fair"; to have races, which included auto races as they were well known when the statute was passed; and to charge entry and admission fees; and the profits, after deducting expenses, were to be paid over to the state. In 1911 the net amount thus paid over exceeded $55,000, the gross receipts being more than $140,000. In other years also profits had been paid to the state and retained by it as profits. Authority to hold a fair and carry on races in order, among other things, to create profits, includes authority to use the ordinary means and agencies to produce such profits. The holding of the fair was state work, done by its direction pursuant to statute. It was the act of the state as much as building the Barge canal or erecting the state capitol. It was a business enterprise to some extent, although not exclusively, and revenue was expected to be derived therefrom and was in fact derived therefrom. Nothing used for the fair except exhibits was owned or contributed by individuals or corporations. The track belonged to the state, the fence was built by the state, the fair was held by the state, the danger was created by the state, the invitation to attend was issued by the state, and the negligence was the negligence of the state.

[3, 4] While the state, being a sovereign, cannot be sued by a subject without its consent, by one of its own statutes passed as an act of justice to its subjects, it has expressly assumed liability for damages caused by "a wrongful act, neglect or default" on its part and has authorized the Board of Claims to hear and determine all claims founded on its negligence, which necessarily means the negligence of its own officers acting within the apparent scope of their powers, or while engaged in conducting its business. Code Civ. Pro. § 264. It has also provided that its liability in such and other cases shall be measured by "such legal evidence as would establish liability against an individual or corporation in a court of law or equity." Id.

The history of legislation on the subject shows progressive growth from 1870 to 1911, with continuous enlargement of power to determine claims against the state. If the language of the statute fails to include such claims as those now under consideration, it is difficult to see what language would. The officers of the state are like the officers of a corporation and bind the state in the same manner by acts done within the limits of their authority. While the commissioners were not authorized to be negligent any more than the officers of a corporation are so authorized, still they had the capacity to be negligent and, if in holding a fair for the state they were negligent, it was the negligence of the state, just as the negligence of officers of a corporation is the negligence of such corporation. Otherwise the assumption of liability by the state for damages caused by "a wrongful act, neglect or default on the part of the state" would be meaningless and without effect. How can the state be guilty of a wrongful act, neglect or default except through its "officers and employés," and if those words were inserted in the statute it

would not add to its meaning. Sipple v. State, 99 N. Y. 284, 288, 1 N. E. 892, 3 N. E. 657. The evidence of negligence in these cases would completely overwhelm a private individual or corporation, and the situation is the same in principle, although the state is defendant. Quayle v. State, 192 N. Y. 47, 51, 84 N. E. 583; Bowen v. State, 108 N. Y. 166, 15 N. E. 56; Burks v. State, 13 N. Y. Court of Claims, 154, less fully reported 64 Misc. Rep. 559, 119 N. Y. Supp. 1089.

[5] Even if Mr. Benjamin was not the agent of the commission, as claimed by the plaintiffs, but was an independent contractor, as claimed by the state, it would not change the result, for it was an independent and actionable act of negligence to permit such a race to be held on such a track owned by the state without reasonable precautions to protect those who had been invited by the state to witness the exhibition and had paid the state for the privilege. Deming v. Terminal R. R. Co., 169 N. Y. 1, 61 N. E. 983, 88 Am. St. Rep. 521.

[6] I am of the opinion, however, that Mr. Benjamin was not an independent contractor within the meaning of the law. On the 6th of June. 1911, he wrote a letter to the commissioner in charge of the State Fair proposing "to put on a high grade lot of attractions for an appropriation of $4,000" which would "guarantee the appearance of at least three of the best known racing men in the country. While our past meets have been very successful," he continued, "it will be necessary to put on a better card than we have had before, and with this appropriation I am confident that I can put on a list of events that would be very attractive. * * * Last year you will note that we secured through Ralph De Palma the one-mile record and the five-mile record. As to my ability to conduct the automobile events successfully there is nothing for me to refer to more than the meets already run by me for you. I have already got my lines out for the leading drivers and I am sure that the 1911 Automobile Day will eclipse all previous efforts. I will agree to handle these events the same as in the past and conduct all the details for a remuneration of $500 and I am sure that you will agree with me that the work is worth the above amount when you consider that I am forced to devote a great deal of time continuously from now until the end of the fair. * * *" The previous arrangements alluded to were that Mr. Benjamin "managed the automobile races, hired the help, hired the attractions and drivers, got up programs, looked after details," and was paid $500 "for his services." The commission accepted Mr. Benjamin's proposition on the same day that it was made, and on the 9th of September authorized the commissioner in charge, "in order to secure Ralph De Palma for auto races, to spend not to exceed $1,000 additional for automobile attractions, making the total expense not to exceed $5,000 exclusive of $500 paid to C. A. Benjamin."

The race was inherently dangerous under the circumstances. Mr. Benjamin furnished nothing and contributed nothing, but simply superintended the race, expended the appropriation for the commissioners, and was paid a certain sum for doing that work. Unless he had absolute control of the work of putting on and conducting the races, with no power in the commissioners to direct or intervene, he was not an independent contractor. If he was to have such absolute control, the contract was void as an abdication of duty on the part of the commissioners. Obviously there was no such intention, and hence he was the hired agent of the commissioners, the same as the aviator.

[7] There was no contributory negligence on the part of the decedents or the living claimants. They attended an exhibition given by the state, on its own ground, upon its invitation and after paying the admission fee charged. The grand stand was full. They stood by the fence, and where else could they stand and see the race which they had paid to see? What everybody did in the presence of the managers, anybody could do. Boyce v. Manhattan Ry. Co., 118 N. Y. 314, 319, 23 N. E. 304. A multitude of people stood by the fence at various points, and the fence looked like an adequate guard, although it was not in fact. There was no other place to stand if they saw the race at all. They were allowed and expected to stand where they did. No warning of danger was given and they had reason to believe the place was safe. It does not expressly appear that they knew the danger of auto racing in general, or the particular danger in this race, and I cannot find from the

circumstances that such unskilled observers knew or should have known it. They had not had the experience and the opportunity to know that the commissioners had. They stood where they had a right to stand in the place provided for them, and in doing so they were not guilty of contributory negligence.

[8] The assessment of damages, difficult in all cases, is especially difficult where death results from the accident. There are so few facts to guide the judgment that the great power intrusted of making an award involves so· many elements of mere presumption as to resemble, although not to constitute, the exercise of discretion. The main elements to be considered are the age of the decedent, his health, habits, qualities, expectation of life and expectation in life, earning ability, income, the prospect of increase of income, the number, age, sex, situation, and condition of those dependent on him for support, and his disposition to support them well or otherwise, and the like. Nothing can be allowed for sentiment, for grief, or for suffering, even when death was not immediate, but the precise question is: What were the probable chances of pecuniary benefit from the continuance in life of the decedent worth under all circumstances? Thomas v. Utica & Black River R. R., 34 Hun, 625; Id., 98 N. Y. 649. Conscious that I cannot satisfy the expectation of the parties in this respect, and realizing that the discriminations made may not be appreciated by the lay mind, after careful reflection I recommend the following awards:

[9] In the case involving the death of William H. McLauchlan, aged 41 years, of good health and habits, highly educated in celebrated schools in this country and in Europe, a scientific man of experience and skill, who had been instructor in chemistry at Princeton university and at the time of his death was employed as an expert chemist by the Solvay Process Company, of Syracuse, on a salary of $175 a month, with participation in the profits amounting to 25 per cent. more, making annually about $2,625 in all, with a reasonable probability of increase upon longer service, devoted to his family and supporting them well, who left him surviving a widow 36 years of age, one child three years of age, and one posthumous child, born shortly after the accident, with practically no means of support, I think an award of $10,000 should be made.

[10] In the case involving the death of Charles E. Ballantyne, aged 27 years, of good health and habits, with regular employment as assistant bookkeeper at a salary of $1,000 per year in a bank, in the ordinary line of promotion, competent and regular in attendance, who left him surviving a widow without means of support, aged 25 years, whom he carefully supported, but no children, I recommend an award of $5,000.

[11] In the case involving the death of Frederick H. Arnold, aged 31 years, of good health and habits, manager for eight years of a publishing corporation, with an earning capacity as measured by his salary of $2,000 a year, with a reasonable prospect of speedy promotion to a larger field with increase of salary, who lost no time at his work and had the custom and disposition to take good care of his family, who left a widow, aged 29 years, and one child, aged four months, both without means of support, I recommend an award of $8,000.

[12] In the case involving the death of the infant, Arthur Frederick Arnold, aged nine years, the award must rest largely on the possibility that, in the future, he would, had he survived, have furnished pecuniary help to his mother in the form of personal services during his minority, or aid in money or its equivalent in her old age if she became destitute. The law says that possibility is worth something and I am commanded to convert it into money. I do so by recommending an award of $500, which is slight, but under the circumstances seems to me just and proper.

In the cases of Peter Lividas and Anna B. Youker, who survived the accident and are still living, while evidence was given before me that they were injured by the accident, none was furnished as to the extent of their injuries, and I leave the assessment of damages in their cases wholly to the Board of Claims without any recommendation, according to the arrangement of counsel.

I request the attendance of counsel when the formal findings are settled, so that all the facts warranted by the evidence may be found and the parties thus protected on the appeals which will doubtless be taken. Any party may have the findings settled on a notice of two days.

Argued before SMITH, P. J., and KELLOGG, LYON, HOW-ARD, and WOODWARD, JJ.

Thomas Carmody, Atty. Gen. (J. A. Kellogg and J. P. Coughlin, Deputy Attys. Gen., of counsel), for the State.

Baldwin & Magee, of Syracuse (Walter W. Magee, of Syracuse, of counsel), for claimants respondents Arnold.

Stilwell, Stilwell, Kelly & Viall, of Syracuse (Lamont Stilwell, of Syracuse, of counsel), for respondent McLauchlan.

Lewis & Monroe, of Syracuse, for respondents Lividas and Youker.

Hiscock, Doheny, Williams & Cowie, of Syracuse (Leroy B. Williams, of Syracuse, of counsel), for respondent Ballantyne.

PER CURIAM. Judgment unanimously affirmed, with costs, on the opinion of the referee.

（163 App. Div. 119)

PEOPLE v. POST.　　(No. 180–119.)

(Supreme Court, Appellate Division, Third Department. July 1, 1914.)

INTOXICATING LIQUORS (§ 197*)—CRIMINAL PROSECUTIONS—JURISDICTION.

Liquor Tax Law (Consol. Laws, c. 34) § 30, subd. A, makes it unlawful for any person, whether having paid the liquor tax or not, to sell liquor on Sunday. Section 36, subd. 2, provides that any person violating any provision of section 30 shall be guilty of a misdemeanor and punished as therein provided, but that this does not apply to violations of section 30 by a person not holding a liquor tax certificate, the punishment for which is provided in the first clause of that section. Subdivision 1 provides no punishment for Sunday sales by a person not holding a liquor tax certificate. Subdivision 5 provides that any violation by any person of any provision of that law, for which no punishment is otherwise provided, shall be a misdemeanor. Section 37, subd. 1, provides that where the penalty for any offense is fixed by section 36, subds. 1 or 2, the offense shall be prosecuted by indictment in a court of record, and subdivision 2 gives Courts of Special Sessions exclusive jurisdiction of violations defined by section 36, subd. 5. *Held*, that the County Court, and not a City Police Court clothed with the same powers as a Court of Special Sessions, had jurisdiction of a prosecution of a person not holding a liquor tax certificate for selling liquor on Sunday, as, no penalty being prescribed for such offense in subdivision 1 of section 36, it was covered by subdivision 2.

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. § 216; Dec. Dig. § 197.*]

Appeal from Schenectady County Court.

Charles Post was convicted of violating the Liquor Tax Law, and he appeals. Affirmed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOW-ARD, and WOODWARD, JJ.

---