Ray Saari, Claimant, *v.* State of New York, Defendant: (Claim No. 30871.)

Robert McCoy, Claimant, *v.* State of New York, Defendant. (Claim No. 30882.)

John G. Nicholson, Claimant, *v.* State of New York, Defendant. (Claim No. 30883.)

John Smeaton, Claimant, *v.* State of New York, Defendant. (Claim No. 30884.)

Court of Claims, February 20, 1953.

*Harold Simpson* for Ray Saari, claimant.

*Walter J. Mahoney* and *Robert J. Ast* for Robert McCoy and others, claimants.

*Nathaniel L. Goldstein, Attorney-General (Joseph A. Drago* of counsel), for defendant.

LOUNSBERRY, P. J. These claims arise from an accident which occurred during the running of the International Grand Prix auto races at Watkins Glen, September 23, 1950. They were tried together and are herewith decided together, but to avoid confusion the term "claimants" will be used to refer to the claimants, Robert McCoy, John G. Nicholson and John Smeaton, who were spectators, and unless otherwise indicated will not include the claimant Ray Saari, who, as a volunteer fireman on fire protection duty, had a somewhat different status.

The International Grand Prix races have been run at Watkins Glen since 1948, and have become an event of major importance in the sports car racing world. Each year they have attracted increasingly large crowds, and in 1950 the most conservative estimate indicates that at least 60,000 persons were assembled along the course to view the contests. The event was jointly sponsored by the Village of Watkins Glen, the Watkins Glen Chamber of Commerce, and the Sports Car Club of America, Inc., under a permit secured from the State of New York through the Department of Public Works.

The race course was 6.6 miles in length, starting at a point in the village of Watkins Glen, thence proceeding in a clockwise direction over a roughly elliptical route along various types of roadway, returning to the finish line in the village. A substantial portion of this course was over a State highway upon which occurred the particular accident which gives rise to these claims.

The above-mentioned State permit was granted under the authority of subdivision 4 of section 88 of the Vehicle and Traffic Law, which reads as follows: " No races or contests for speed shall be held upon any street without the permission of the authorities of the state, city, town or village having jurisdiction and unless the same is fully and efficiently patrolled for the entire distance over which such race or contest for speed is to be held."

Since the interpretation of the permit is an important element in this case, we set forth herein the provisions thereof which we deem most relevant to the problem at hand (the term " permittee " referring to the three sponsors above named):

2. Three races comprising the Seneca Cup Race, 15 laps, 99.0 miles; the Queen Catherine Cup race 8 laps, 52.8 miles; and the International Grand Prix, 15 laps, of same 6½ mile course, 99.0 miles, are to be run on September 23, 1950. The course to be followed, together with notations as to warning signs, location of flagmen and/or policing officers, barricades, protection devices, locations prohibited to spectators are shown on the accompanying map and all of such equipment and devices necessary therefor will be provided by the Permittee * * *

3. Suitable arrangements for patrol and control of highways will be made by the permittee after consultation with and agreement of John C. Cronin, County Assistant Engineer, or such other representative of the Department of Public Works as may be designated.

4. A warning signal audible to residents on the course is to be given not less than five minutes before the start of each race. Residents shall be informed in advance of the nature and purport of such signal by the permittee.

5. The three races shall follow each other in a minimum of time required to conduct them properly. The permittee agrees to scrutinize carefully and patrol the course prior to each race and to take such immediate additional steps as appear in the interest of safeguarding persons and property. * * *

8. Care shall be taken that spectators of the races shall in no way be exposed to danger * * *

10. The permittee shall provide a sufficient number of police officers for the adequate directing and safeguarding of all contestants, spectators and other users of the highways and streets. * * *

15. The Superintendent of Public Works reserves the right to revoke or annul this permit at any time, should the said permittee fail to comply with the terms and conditions upon which it is granted.

Attached to the permit was a map of the course setting forth in considerable detail the places where warning signs were to be located, and specifying the areas where no spectators were to be permitted and the areas where spectators were to be permitted only at some specified distance from the road. It also showed where certain barriers were to be erected, particularly within the village itself and at certain sharp turns.

The three claimants, Nicholson, McCoy and Smeaton, were Canadian citizens residing at Windsor, Ontario, who, in company with three others, drove down especially to see the Grand Prix races. They arrived early in the morning of the race day made a complete tour of the course, and inspected some of the racing cars. In midmorning they parked their car in a parking lot along the course, after which they walked along the course in a counter-clockwise direction, thus facing the prospective racers, seeking a good vantage point from which to view the contest. This course of procedure, with some interruptions which are not particularly relevant, eventually led them to a position near two posts marking a culvert, but a National Guardsman, who appeared to be on police duty, advised them that they could not stand there, and told them to move " over there ", pointing to a spot about fifty feet away, where Mr. Saari was standing with his fire extinguisher. They proceeded to that point and thereafter stood near Saari. The guardsman followed along and was also standing near Saari at the time of the ensuing accident. There is no evidence that he gave them any further directions or made an objection to their new position.

The position thus taken was on the left-hand, or north side of the road, traveling counter-clockwise, which would be on the right-hand side of the approaching racing cars, just beyond the end of a straightaway on the race course and on the outside of the entrance to a $9\frac{1}{2}$ degree curve. Reference to the map attached to the permit shows that it was within an area completely forbidden to spectators.

The road had a twenty-foot wide blacktop pavement, which had been completely renewed in the summer of 1950 and was

in good condition, and had nine-foot gravel shoulders on either side of such pavement. The claimants and Saari were standing near the outside edge of the shoulder, which would place them approximately nine feet from the north edge of the pavement.

The first race was started with a pace lap, followed by the first racing lap. The claimants witnessed the pace lap, which was run at a moderate speed of about forty miles per hour, and then watched the first cars of the first racing lap approach and pass. They estimated their speed at between eighty and one hundred miles per hour. The racers came in groups of two or three cars, as did the second group. All of the claimants turned to watch the cars in the second group round the curve, at which juncture one car in the third group somehow ran off the road and crashed into the claimants and Saari, injuring all of them. Neither the claimants nor any of the other witnesses saw the car approaching, all having been occupied at the moment in observing the progress of the second group around the curve beyond.

There is no evidence that the car left the road because of any defect in the highway, or of any mechanical defect in the racing car itself. In fact there is virtually no evidence as to the cause of the occurrence.

Neither the claimants nor any of their witnesses observed in the vicinity any signs with respect to spectators, either to indicate that the area was forbidden to spectators, or to indicate that spectators were to remain at least twenty-five feet or fifty feet, or any other specified distance away from the road. Some of the State witnesses gave some testimony to the contrary, but the court is satisfied that there were in fact no such signs anywhere near the place of the accident, and that there were no barriers, ropes, or other devices to indicate where spectators were and were not to stand. The only police officer on duty in the vicinity was the above-mentioned National Guardsman.

Mr. Saari was a volunteer fireman, a member of the Mecklenberg Fire Department, who, together with other members of his company, was present at the request of the Watkins Glen fire chief to lend assistance in the event that one of the racing cars should catch fire. He had performed the same duty at the same spot at the time of the 1949 race. Such service was, of course, not obligatory, but was rendered by Saari and the members of his company as a part of their general duties as volunteer firemen and in order to assist the neighboring Watkins Glen fire department in carrying out the duties of the day.

Unfortunately, Saari's injuries were so serious that he has no recollection either of the accident itself, or of the events preceding it, except for a hazy recollection of the trip from Mecklenberg to Watkins Glen. The testimony of the Watkins Glen fire chief and his assistant was that Saari volunteered for duty at this particular point because it was the nearest to the point where the rest of his company was stationed, and that it was the same place where he had performed a similar duty the year before. They admitted that a fireman was located at this particular point because the existence of the curve made it a place where an accident might occur, but insisted that Saari's instructions were general only, and that he was not ordered to stand at the particular spot where he did stand. He was, they said, simply instructed to stand in any clear space where he would have a good view of the road in both directions and to use his own judgment. Saari, of course, is not in a position to contradict this testimony, but he does testify that in 1949 he was specifically placed at this particular spot. At any rate, no one seems to have made any objection to his position or to have warned him of any danger involved.

Although the permit provided that suitable arrangements for patrol and control of the highway were to be made after consultation with John C. Cronin, county assistant engineer, Mr. Cronin was in fact superseded and had nothing to do with the arrangements. On the morning of the races, Mr. Charles Maher, traffic engineer, and Mr. Kenneth W. Cosgrove, safety engineer, from the Hornell office of the Department of Public Works, arrived on the scene and advised Mr. Cronin that Mr. Samuel Ehrenrich, assistant district engineer, had been designated to represent the Department of Public Works for the race. Mr. Maher testified that he had been connected with race arrangements in the years 1948 and 1949 and that in 1950 he represented the department in all questions concerning them. The advance arrangements, he stated, were made chiefly by telephone. On the day of the race he toured the course around 9:30 in the morning to determine whether the terms of the permit had been complied with, and concluded that there had been such compliance. It develops from his testimony, however, that he was particularly concerned with curve warning and no-passing signs, which of course have to do primarily with the safety of the racers themselves, rather than with the safety of the spectators. Mr. Cosgrove testified that he accompanied Mr. Maher on this tour of inspection. Mr. Ehrenrich did not testify.

The permit also provided that a warning signal audible to residents on the course would be given before the start of each race. State witnesses testified that a sound car, preceded by a State Police car, was sent around the course just prior to the start of the first race to clear the course. None of the claimants or of the other witnesses heard any announcements from any sound car, however.

Captain Gay, who was in charge of a contingent of twenty-one State Police, insists that before the race he ordered a group of persons standing in the general vicinity of the accident to cross the road to the other side, which was considered a much safer position. There is absolutely no other testimony, however, to indicate that the claimants or Saari were in the group, and none of them had any recollection of any such incident. We can only conclude that if it occurred at all, it occurred in connection with some other group of persons.

It is, of course, incumbent upon all the claimants, including Saari, if they are to recover herein, to establish that the State owed them some duty in the situation, and that it failed properly to discharge such duty. It is apparent that the well-established duty of the State to maintain its highways in a reasonably safe condition for travelers thereon is not applicable in this situation. None of the claimants was a traveler. The highway was closed to general traffic and had been converted, for the time being, into a race course. McCoy, Nicholson, Smeaton and the others of their party were spectators who had come for the specific purpose of witnessing the races. Saari was present for the specific purpose of rendering fire protection in connection therewith. The duty of the State, if any, must therefore be sought elsewhere, and cases dealing with injuries to travelers on the highway, including even those cases wherein a traveler has casually paused to observe some event which has attracted his attention, are not here relevant.

We think, however, that the State did have a duty to these claimants. The statute under which the permit for the races was issued, namely subdivision 4 of section 88 of the Vehicle and Traffic Law, above quoted, requires as a condition for the issuance of a permit for such races that the highway be fully and efficiently patrolled over the entire distance of the race course. This requirement is undoubtedly a legislative recognition to spectators as well as participants, unless careful safety precautions are taken. It requires no proof other than common observation and common sense that there is present

in high speed auto racing a constant danger that a racing car, operating at high speed, may hurtle from the course by reason of skidding, collision, mechanical failure, or loss of control, to the great peril of any spectators in its path. The risk being high, the standard of care must likewise be high. One who conducts or sponsors such an event is in our opinion negligent, unless he uses a high degree of care to provide adequate safeguards against reasonably foreseeable dangers to spectators and enforces the observation of such safeguards and precautions, both by participants and by spectators.

Our courts have recognized the dangerous nature of the sport and the necessity for the exercise of care for the safety of the spectators. *Arnold* v. *State of New York* (163 App. Div. 253) arose from an accident which occurred when a racing car, taking part in auto races conducted at the New York State Fair, left the track, plunged through a wooden fence, and killed or seriously injured a large number of spectators assembled behind the fence. Spectators were expected to stand behind this fence, and indeed there was no other place for them since the grandstand was full, but it was entirely inadequate to protect them. The court said (p. 260): "I hold the State liable for holding or permitting to be held on its own ground, under the circumstances disclosed by the evidence, such a fast race, with powerful cars, on an unprotected track, without the exercise of reasonable care to provide against accidents well known to be likely to happen." The situation required, the court held, far more adequate barriers or other safeguards than were employed.

In the *Arnold* case, of course, the State was actually conducting the race on its own ground and made an admission charge, and thus it is not wholly parallel with the present case. We doubt, however, after a careful reading of the decision, that the result would have been any different had the race been conducted by independent sponsors, using the track by State permission.

In *Johnson* v. *City of New York* (186 N. Y. 139) where automobile speed tests, very similar to races, were conducted on a public highway, resulting in injury to a spectator when one car left the highway, the court held that the conduct of such tests on a public highway was a nuisance per se. It is true that the court returned the case for a new trial on other grounds, but the opinion is still significant as a judicial recognition of the inherent dangers of racing, particularly upon a public highway.

In the light of the standard of care thus established, we now inquire whether the precautions observed in connection with the Grand Prix races were adequate to protect spectators. We think they were not. We have already shown that all of the claimants were standing in an area forbidden to spectators, and that there were no warning signs or other devices to apprise them of such fact. The only other means by which they could have learned that they were in a forbidden location would have been through warning by police officers, but there was no such warning. The only police officer who took any action, so far as these claimants were concerned, was the National Guardsman, and his action consisted only in moving them from one forbidden area to another. This is scarcely the full and efficient patrolling which the statute requires.

In fact we do not feel that the patrolling generally was either full or efficient over the distance of the course. The number of State police officers was quite obviously insufficient for the length of the course, and they were in fact placed only at certain particularly dangerous intersections or corners. There evidently were other persons assigned to police duty, but there is little evidence as to what instructions they received or as to who was responsible for their activities. The State police captain specifically declined in advance any responsibility for police precautions beyond the assignment of his own men. It would not be difficult to predict what sort of patrolling would result from such un-co-ordinated activities, and the actual performance of the National Guardsman in question was a logical result. It seems a reasonable inference from his own brief statement and from all the circumstances that he had no specific information as to the location of zones forbidden to spectators.

Incidentally, it is also evident that the warning signal supposed to be given before the start of the race never reached the claimants. Since they actually observed that the race was under way, this omission has no direct bearing on their situation, but it does seem significant as further evidence of failure to take required and necessary precautions.

All that has been said thus far is obviously applicable to the sponsors of the race. There still remains, however, the crucial question whether it also applies to the State in such manner as to render the State liable to the various claimants. To arrive at an answer to this question requires the consideration of several different elements in the situation. First, it must be recognized that the State was not the financial sponsor of the

Grand Prix races, and derived no benefit therefrom. The benefits, if any, inured to the three sponsoring bodies. Second, it must also be recognized, however, that the statute above mentioned imposes a duty that the highway to be used as a race course be fully and efficiently patrolled over the entire distance of the course. The patrol of highways is a governmental, not a private, function and it seems, therefore, a reasonable conclusion that the duty of patrol under the statute must rest upon the governmental unit in control of the highway used for the race. Here that unit was the State.

Third, the whole wording of the permit indicates an intention to shift the responsibility for the patrol of the races from the State to the permittees. This raises the question whether such responsibility can thus be delegated so as to relieve the State from any liability in the event that the patrolling should prove inadequate. There are, of course, nondelegable duties. One of these is the duty above mentioned to travelers on the highway (*Deming* v. *Terminal Ry. of Buffalo,* 169 N. Y. 1; *Miller* v. *State of New York,* 231 App. Div. 363). Another is that of an owner or employer who delegates the performance of work likely to cause harm to others unless proper precautions are taken. We have recently considered the latter duty, and its variations, in *Janice* v. *State of New York* (201 Misc. 915). We have found no case dealing specifically with the question of delegability of patrol duty but on principle we see no reason why such a governmental duty should be deemed any more delegable than the other duties before mentioned. The actual work of patrolling may be assigned to others, but not, we believe, the ultimate responsibility therefor.

We further conclude that the permit itself did not accomplish a complete transfer of responsibility, even if such were intended or permissible. The requirement of advance consultation concerning arrangements and the reservation of the power of revocation for failure to comply with the various requirements of the permit are not consistent with a complete abdication from authority and responsibility.

The advance arrangements were made chiefly by telephone, aside from Captain Gay's conference with the representatives of the permittees, which conference did not result in any adequate police plan, and the approval of arrangements must have been based either on telephone conversations or on the inspection made the morning of the race day. Neither formed a very satisfactory basis for such approval, particularly in

view of the fact that the inspection should have revealed the lack of warning signs or other devices in connection with the forbidden zones. At this juncture, had the omission been observed, the State would have been in a position to cancel the permit or at least to prohibit the start of the races until measures had been taken to supply the omission.

We are thus brought to this position: The State, under the statute, had a duty to see that the highway was fully and efficiently patrolled, and under the permit which it issued, it retained certain powers with respect to safety precautions generally. The patrolling was in fact neither efficient nor full, and not all of the required precautions were taken. This, we conclude, spells negligence on the part of the State, as well as on the part of the sponsors.

In addition, we feel that there is an element of public policy involved. Under the statute the authority to issue a permit for the conduct of races is permissive only. Such authority ought to be exercised with discretion and circumspection where the danger is so great. The winding secondary roads comprising the bulk of the race course were not constructed for racing or even for high-speed regular driving. Credible expert testimony showed that the safe speed at the point of the accident was little more than forty miles per hour. The responsible State officials knew from past experience that the racers would operate at much higher speeds; indeed Mr. Maher stated that they attained speeds of 120 miles per hour at points. The car which struck the claimants was traveling at least eighty miles per hour. It should have been obvious that under such circumstances a very substantial risk existed that racing cars would leave the course, to the peril of the spectators. Hence, while we recognize the legality of the issuance of the permit, we seriously question its wisdom.

The foregoing is probably conclusive of the matter so far as the negligence of the State is concerned, but there are some other items which have been raised in the briefs to which we wish to give some attention. One is the assertion by the claimants that no actual legislative authority exists for the issuance of a permit to conduct races on a State highway. This assertion is based on an analysis of the legislative history of the above-cited subdivision 4 of section 88 of the Vehicle and Traffic Law, but we are unable to agree with the conclusion reached. If the claimants' contention is correct, then the references in this section to permission and to patrolling become meaningless,

and the statute might as well read, "No races or contests for speed shall be held on any street." It does not so read. In our opinion its actual wording necessarily implies that permits may be granted for the conduct of such races on public highways, upon the condition that the requirement for full and efficient patrolling be met.

The claimants also contend that the Grand Prix races constituted a public nuisance under section 1530 of the Penal Law. This section provides in part as follows: "A public nuisance is a crime against the order and economy of the state, and consists in unlawfully doing an act, or omitting to perform a duty, which act or omission: 1. Annoys, injures, or endangers the comfort, repose, health or safety of any considerable number of persons; or, * * * 3. Unlawfully interferes with, obstructs, or tends to obstruct or renders dangerous for passage, a * * * street, or highway; or 4. In any way renders a considerable number of persons insecure in life, or the use of property."

It can certainly be argued that the Grand Prix races, as we have described them, can be fitted into the foregoing definition of a public nuisance. There is more to the matter, however.

In the first instance, it must be noted that under the above statute, the act or omission which may constitute a public nuisance must be unlawful. We have already indicated above our opinion that the granting of the permit for the Grand Prix races was lawful, even if unwise, under subdivision 4 of section 88 of the Vehicle and Traffic Law. Another troublesome point is the fact that a public nuisance is an offense against the State for which the State may prosecute itself for maintaining a public nuisance, or that it might prosecute the sponsors of the race, having issued them a permit to do the very act contended to constitute a public nuisance. It is also true, however, that in addition to public prosecution for maintaining a nuisance there exists a right of private action for special damages resulting from a public nuisance. In fact the latter action may exist even where public prosecution would be prohibited or at least unsuccessful. Thus in *People* v. *Brooklyn & Queens Transit Corp.* (283 N. Y. 484) the court dismissed an indictment for maintaining a public nuisance brought against a street railway company, arising from its practice of shuttling empty cars back and forth during the late hours of the night with much noise and commotion. The court found that such operations, arising in the regular course of business conducted

under a franchise and along a right of way granted by the public, did not constitute an injury to the general public. It implied, however, that a right of private action might exist, quoting from *Baltimore & Potomac R. R. Co.* v. *Fifth Baptist Church* (108 U. S. 317, 332) as follows: "The acts that a legislature may authorize, which, without such authorization, would constitute nuisances, are those which affect public highways or public streams, or matters in which the public have an interest and over which the public have control. The legislative authorization exempts only from liability to suits, civil or criminal, at the instance of the State; it does not affect any claim of a private citizen for damages for any special inconvenience and discomfort not experienced by the public at large."

We have already pointed out that in *Johnson* v. *City of New York* (186 N. Y. 139, *supra*) the court called the speed tests a nuisance per se. In that case, however, the court found that the permit was unlawfully granted, which distinguishes the situation from that existing in the Grand Prix case. It reversed a trial court decision in favor of the injured plaintiff upon the ground that, as one who had come to observe and enjoy the race, she was not in a position to assert as a ground for recovery the illegality of the issuance of the permit. The door was not closed to eventual recovery, however, since the case was returned to determine, among other things, whether there was negligence in the actual conduct of the speed tests.

In *Landau* v. *City of New York* (180 N. Y. 48) there also existed the element of illegality of the issuance of the permit. In that case the city council attempted to suspend an ordinance forbidding the discharge of fireworks within the city for a period of two weeks around election time. A political group, depending on the supposed suspension, staged a large parade, climaxed with a display of fireworks at Madison Square. Some 75,000 persons were assembled for the event and a number were killed by a premature explosion of fireworks. The court held that the display of fireworks on a crowded street was a nuisance, and that the city having illegally permitted the same, was a participant therein, and was liable in the same manner as if the city had itself created the nuisance. The immediate significance of the decision in the present situation is that it apparently recognized a right of action by spectators, even though voluntarily present.

In view of the inherent danger of automobile racing along an unprotected course such as the highway in the present case,

and in view of the established judicial attitude toward such racing, we are of the opinion that while the Grand Prix race did not constitute such a public nuisance as could be enjoined by a public prosecution, it did constitute a nuisance as to those persons particularly affected thereby, for which they have a private right of action.

We do not mean to imply that a governmental unit which issues a license is automatically liable for any injury which results from the exercise of the privilege licensed. If the act licensed is one which can be conducted in such manner. as not to create a nuisance or involve injury to others, the unit of government issuing the license is not liable for negligence on the part of the licensee. This general rule is set forth and well annotated in 42 American Law Reports 1208. Where, however, the act is one which will constitute a nuisance or will involve a high risk of injury, the municipality may be held liable. The principal authority for this exception to the general rule is the *Landau* case previously discussed.

There still remains the question whether the claimants are barred from recovery by reason of the doctrine of assumption of the risk. As applicable here that doctrine is that one who knows that another has created a danger or is doing a dangerous act, and who nevertheless chooses to enter or remain within the area of risk, is not entitled to recover for harm unintentionally caused him by the other's conduct or the condition of the other's premises (Restatement, Torts, § 893).

Questions have frequently arisen concerning the application of this doctrine to spectators at various amusement or sporting events. The results are not wholly consistent. Generally, however, it may be said that such spectators or patrons assume the obvious dangers arising from the normal operation or conduct of the sport or amusement in question. Thus, at baseball games, the spectator who chooses to sit in the bleachers, unprotected by a screen, may not recover if struck by the ball. Baseball is so familiar a sport that everyone is presumed to realize the danger. The result is different, however, if the spectator places himself behind a screen, supposedly designed to protect him. If he is then struck by the ball by reason of a defect in the screen, he may recover. In New York, the patron of a hockey game is presumed to know that he may be struck by a puck flying from the rink. Other States have sometimes reached the opposite conclusion on the ground that hockey is a less well-known sport than baseball, and that the patrons would not be expected to know that the puck might leave the rink.

In any event, patrons or spectators are not obliged to make a critical examination of the premises and are entitled to expect that every reasonable precaution has been taken for their safety. (See on the subject generally the annotations appearing in 22 A. L. R. 616, 29 A. L. R. 30, 38 A. L. R. 358, 44 A. L. R. 203, 61 A. L. R. 1291, 98 A. L. R. 560, and 149 A. L. R. 1174.) As applied to racing the cases collected in the foregoing annotations hold generally that there is a duty of reasonable care on the part of the operator to keep the space reserved for spectators free from danger. We have already indicated our own opinion that in New York a high degree of care is required in such cases.

*Johnson* v. *City of New York* (*supra*) had been cited as authority for the proposition that one who attends a speed test or race assumes the risk of injury by a car leaving the course. We do not believe that the case actually so holds. The basis of decision was that one who voluntarily attends such an event is not in a position to assert the illegality of the permit for conducting the event as a ground for recovery. It does not close the door to recovery by the spectator based on the negligence of the operator of the race.

In *Arnold* v. *State of New York* (163 App. Div. 253, *supra*) the court did not discuss the doctrine of assumption of the risk as such, but it did hold that the spectators were free from contributory negligence in standing in the place where the accident occurred. It said (p. 264): " They were allowed and expected to stand where they did. No warning of danger was given and they had reason to believe that the place was safe. It does not expressly appear that they knew the danger of auto racing in general, or the particular danger in this race, and I cannot find from the circumstances that such unskilled observers knew or should have known it. * * * They stood where they had a right to stand in the place provided for them, and in doing so they were not guilty of contributory negligence."

It cannot be denied that the claimants Nicholson, Smeaton, and McCoy were all intelligent persons, familiar with automobiles, and aware that the racers would be traveling at high rates of speed. On the other hand, the official program of the races, copies of which they had purchased, assured them that every possible safety precaution had been taken to insure the safety of the spectators, and they were entitled, we think, to assume that this was so. In the absence of any signs or other warning devices, they were entitled, we believe, to assume that it was

proper to stand at the point of the accident, particularly in view of the fact that they were directed to that position by the National Guardsman. It must also be borne in mind that none of them had actually witnessed an automobile race before. In the light of these considerations, we have concluded that these claimants cannot properly be charged with assumption of the risk, and that by the same token they were not guilty of contributory negligence.

Saari, of course, was under no legal compulsion to undertake fire protection duty. He was under the very practical compulsion, however, that as a loyal and obedient member of his fire company he was expected to take part in the service which it had undertaken to render. To hold that he is barred by assumption of the risk, while the other claimants are not, would be unreasonable and inequitable. He was certainly entitled as much as they to assume that all possible precautions had been taken and was further entitled to assume that he had received proper instructions from those who placed him at the location where he was stationed. Furthermore, he has the benefit of one rule not applicable to the others. Under the rule established in *Meiers* v. *Koch Brewery* (229 N. Y. 10) a fireman apparently occupies the status of an invitee when coming upon property in the course of performance of his duty. In that particular case, a fireman injured by reason of an unguarded coal hole on the premises to which the fire company had been called, was permitted to recover from the owner of the premises. Applied to this case, this rule would seem to imply that the sponsors of the race were under a duty to provide him with as reasonably safe a place to work as could be done under the circumstances. This, we think, they failed to do, both by reason of the same absence of warning signs previously discussed, and by reason of failure to warn him of the danger involved in standing at the particular location. This leaves the State in the same position with respect to Saari as it is in with respect to the other claimants, namely, that it was negligent in failing to patrol the course adequately, and in failing to insist upon the observance of the safeguards which it had itself required.

We conclude, therefore, that all four claimants are entitled to recover damages from the State of New York.

The claimant John G. Nicholson suffered deep shock, concussion of the brain, large hematoma of scalp, lacerations of frontal area of scalp, laceration of the bridge of the nose, laceration of the upper lid of right eye, all of which required suturing.

The claimant also had a badly comminuted compound fracture of the left leg, with bad angulation and distortion. He also suffered a comminuted compound fracture of the right leg; both the tibia and fibula were fractured at the lower one third. Claimant was hospitalized until October, 1950, at Montour Falls, N. Y., and was then moved to the Metropolitan General Hospital in Windsor, Ontario, Canada, his home, where he remained until November 30, 1950. He was confined to his bed until March, 1951, thereafter was compelled to use first a wheelchair and then crutches until the end of August, 1951. At the time of trial in December, 1951, he was still using two canes, and there was marked limitation of movement of the right knee and foot. His loss of earnings amounted to $3,150; his medical and hospital bills to $1,571.25, and damage to personal property, $10. We award him said sums, totalling $4,731.25, and in addition thereto the sum of $25,000 for his pain, suffering and personal injury, making a total award of $29,731.25.

The claimant John Smeaton suffered assorted cuts and bruises with marked tenderness of the right knee joint and marked swelling of the right leg. He was confined to the hospital for two weeks, used crutches for four weeks thereafter, and limped until June, 1951. The leg still aches occasionally and there is some possibility of later development of arthritis. He lost earnings in the amount of $364, incurred medical and hospital expense totalling $145, and damage to personal property in the amount of $250. We award him these sums, totaling $759, together with the sum of $3,000 for his pain, suffering and injuries, making a total of $3,759.

The claimant Robert McCoy suffered cuts and bruises of both legs, and still limped and complained of some stiffness and pain in the knees at the time of trial. His loss of earnings and medical and hospital expenses totalled $157.32, and in addition thereto we award him the sum of $2,000 for his pain, suffering and injuries, making a total award of $2,157.32.

The claimant Ray Saari suffered a severe brain concussion with loss of memory for around two weeks, a fractured sacrum, a compound comminuted fracture of both bones of the left leg, as well as bruises and lacerations, was confined to hospitals for two months following the accident, and subsequently was returned twice for further operations on the leg. At the time of trial, he walked with a pronounced limp and was compelled to wear a bandage on the left leg at all times to prevent swelling. He was also compelled to wear a sacroiliac support on his back,

He continues to suffer pain, nausea and headaches, and exhibits loss of memory and marked irritability. There is a definite permanent partial disability both of the back and the leg and a danger of osteomyelitis recurring in the leg. He is unable to perform gainful work. His loss of earnings to the time of trial amounted to about $3,000, and his medical and hospital expenses totalled $1,806.80. At the time of trial he was twenty-one years old, was married and had one child. For his loss of earnings, medical and hospital expenses, severe pain, suffering and permanent partial disability we award him the sum of $44,806.80.

The foregoing constitutes the written and signed decision upon which judgment may be entered (Civ. Prac. Act, § 440).